UNITED STATES, Plff.,

*v.*

JUAN G. IGLESIAS, Dft.

San Juan, Criminal, No. 3178.

Opinion filed January 23, 1924.

*Major Ira K. Wells,* United States District Attorney, and *Major J. A. Smith* of the Judge Advocate General's Department of the United States Army, for the United States.

*Mr. Juan B. Soto* for Juan G. Iglesias.

*Honorable H. P. Coats,* Attorney General of Porto Rico, and *Honorable Miguel Muñoz Morales,* Assistant Attorney General of Porto Rico, amici curiæ.

ODLIN, Judge, delivered the following opinion:

The question submitted to this court at this time for determination is one of the very highest importance, and the peculiar facts which surround it make it one absolutely of first impression. Counsel for the United States and the attorney for Juan G. Iglesias have filed in the office of the clerk of this court an agreed statement of facts which contains fourteen paragraphs, and which is so carefully framed that I can do no better than to incorporate the same as part of this opinion, as follows:

### Agreed Statement of Facts.

It is hereby stipulated and agreed by and between Ira K. Wells, United States attorney, representing the plaintiff, and Juan B. Soto, attorney for the defendant, Juan G. Iglesias, that for the purposes of consideration and determination of the question of jurisdiction of the Federal court in this case, the following facts deemed material to such determination are hereby admitted to be true and undisputed:

1. That the Santo Domingo Barracks, including all that

piece or parcel of land situated on San Juan island, in the city of San Juan, Porto Rico, and known as the Santo Domingo Barracks site, adjoining the Church of San Jose, is the property of the United States of America.

2. That said Santo Domingo Barracks and the land on which the same is situate constitute a portion of the property ceded to the United States of America under article 8 of the treaty of peace between the United States of America and the Kingdom of Spain, signed in Paris on December 10, 1898, and promulgated on April 11, 1899.

3. That possession of said property was delivered by the duly accredited representatives of the government of Spain to the military authorities on or about August 12, 1898, who took possession thereof and administered the same as the instrumentality of the Federal government.

4. That until the passage of the Act of July 1, 1902, all lands, buildings, and other property acquired from Spain remained under the control of the Federal government, except to the extent that temporary control may have become vested in the Insular government under and by virtue of § 13 of the Act of Congress approved April 12, 1900, known as the Foraker Act (31 Stat. at L. 77, Comp. Stat. § 3760, 7 Fed. Stat. Anno. 2d ed. p. 1266), which provided: "That all property which may have been acquired in Porto Rico by the United States under the cession of Spain in said treaty of peace in any public bridges, roadhouses, water powers, highways, unnavigable streams, and the beds thereof, subterranean waters, mines, or minerals under the surface of private lands, and all property which at the time of the cession belonged under the laws of Spain then in force, to the various harbor-works boards of Porto

Rico, and all the harbor shores, docks, slips, and reclaimed lands, but not including harbor areas or navigable waters, is hereby placed under the control of the government established by this act to be administered for the benefit of the people of Porto Rico; and the legislative assembly hereby created shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all such matters as it may deem advisable."

5. That on July 1, 1902, the Congress of the United States passed an act entitled, "An Act Authorizing the President to Reserve Public Lands and Buildings in the Island of Porto Rico for Public Uses, and Granting Other Public Lands and Buildings to the Government of Porto Rico, and for Other Purposes," § 1 of which reads as follows: "That the President be, and he is hereby, authorized to make, within one year after the approval of this act, such reservation of public lands and buildings belonging to the United States in the Island of Porto Rico, for military, naval, lighthouse, marine hospital, postoffices, customhouses, United States courts, and other public purposes, as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said Island and not so reserved, be, and the same are hereby, granted to the government of Porto Rico, to be held or disposed of for the use and benefit of the people of said island; Provided, That said grant is upon the express condition that the government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this act: And provided further,

That nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the government of Porto Rico or by any other party, under any contract, lease, or license made by the United States authorities prior to the first day of May, nineteen hundred." [32 Stat. at L. 731, chap. 1383, Comp. Stat. § 3761, 7 Fed. Stat. Anno. Supp. p. 1281].

6. That pursuant to said Act of Congress approved July 1, 1902, the President, by executive order dated June 30, 1903, reserved for military purposes certain described lands, with the buildings thereon, situated in the Island of Porto Rico, including among others, the following: "All that piece or parcel of land situated on San Juan Island, in the city of San Juan, Porto Rico, and known as the Santo Domingo Barracks site, adjoining the church of San Jose."

7. That after Congress passed the Act of July 1, 1902, the legislature of Porto Rico passed an act approved February 16, 1903 (Sess. Laws 1903, p. 110) entitled "An Act Authorizing the Governor of Porto Rico to Convey Certain Lands to the United States for Naval, military, and Other Public Purposes," §§ 5 and 6 thereof reading as follows:

Sec. 5. "That consent be and is hereby given to the United States to acquire for naval, military or other public purposes, by purchase or condemnation, any lands within the Island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United States, all jurisdiction over such lands by the people of Porto Rico shall cease and determine, provided, however, That upon the subsequent alienation by the United States of any land so acquired the people of Porto Rico shall again have jurisdiction thereover."

Sec. 6. "That exclusive jurisdiction be and is hereby ceded

to the United States over any and all lands that may hereafter be acquired by it in the Island of Porto Rico by purchase or condemnation; and over any and all lands and the shores thereof, including streets and other public highways, conveyed to it by the governor of Porto Rico under the provisions hereof; and over any and all lands in which any interest or claim of the people of Porto Rico may hereafter be released to the United States by the governor of Porto Rico as provided herein: provided, however, that in and over any lands acquired by or conveyed under the terms hereof to the United States, in the Island of Culebra, the people of Porto Rico shall retain a concurrent jurisdiction with the United States over offenses committed within the limits of the lands so conveyed, such jurisdiction however to be exercised only upon the complaint of the officer of the Navy or other officer of the United States in charge thereof." [Compilation 1911, §§ 1674, 1675.]

8. Under the provisions of an act of the legislative assembly of Porto Rico on March 10, 1904, attorney Juan Hernandez Lopez in the name and on behalf of the Right Reverend Bishop of the diocese of Porto Rico, filed a complaint against the people of Porto Rico in the supreme court of Porto Rico, claiming among other properties title to what was formerly known as the Santo Domingo Convent, being the same property herein referred to as the Santo Domingo Barracks, and the supreme court, by a decision dated December 15, 1906 (11 P. R. Rep. p. 466) decided the case in favor of the Church as to certain properties, but dismissed the complaint as to the convent of Santo Domingo and appurtenant lands, which is the property referred to herein as the Santo Domingo Barracks.

9. As a result of the controversy over the title to the certain

properties involved in said suit instituted in the supreme court of Porto Rico, and in order to bring to an end the controversy in regard to certain property claimed to be the property of the Roman Catholic Church of Porto Rico and held in part by the United States and in part by the people of Porto Rico, an agreement was entered into on the 12th day of August, 1908, by a commission consisting of two persons appointed by the President of the United States, two persons representing the Roman Catholic Church of Porto Rico, and two persons representing The People of Porto Rico, appointed by the governor thereof, intended as a basis of settlement of all matters of dispute between the Roman Catholic Church in Porto Rico, on the one part, and the United States of America and the people of Porto Rico on the other part, in which it was agreed, among other things, as follows: "The United States to pay the Roman Catholic Church in Porto Rico the sum of $120,000 in full settlement of all claims of every nature whatsoever relative to the properties claimed by the Church, which are now in the possession of the United States, and are specified and described in the judgment rendered by the supreme court of Porto Rico in a certain suit No. 1, brought by the Church against the people of Porto Rico, in the supreme court of Porto Rico, the Church to relinquish all rights and actions regarding said properties, the said properties to belong exclusively to the United States."

10. By an act approved March 4, 1909 (35 Stat. at L. 1018, chap. 299), the Congress of the United States made an appropriation for the purpose of giving effect on the part of the United States to said basis of settlement, the portion of said act relating thereto reading as follows: "Payment to the Catholic Church in Porto Rico. To give effect on the part of the

United States to the basis of settlement of all matters in dispute between the Roman Catholic Church in Porto Rico on the one part, and the United States and the people of Porto Rico on the other part, signed at San Juan, Porto Rico, on August twelfth, nineteen hundred and eight, by commissioners for the United States, the Roman Catholic Church of Porto Rico, and the people of Porto Rico, respectively, the Secretary of the Treasury is hereby authorized to pay to the Bishop of Porto Rico as the representative and trustee of the Roman Catholic Church in that Island, and for the exclusive benefit of the Roman Catholic Church in Porto Rico, the sum of one hundred and twenty thousand dollars, in full satisfaction of all claims of every nature whatsoever relative to the properties claimed by the Roman Catholic Church in Porto Rico, which are now in the possession of the United States, to wit, the building known as the Santo Domingo Barracks and the land pertaining thereto, and the site of the building formerly known as the Ballaja Barracks, now known as the Infantry Barracks, both properties in the city of San Juan, Porto Rico; provided, That the Roman Catholic Church shall guarantee the title to, and shall relinquish all rights and actions regarding said properties, and that the said properties shall belong exclusively to the United States: And provided further, That upon acceptance of this sum the Roman Catholic Church shall relinquish all claims of any kind whatsoever against the United States arising in Porto Rico prior to the approval of this act."

11. Thereafter, to wit, on May 17, 1909, the United States paid to the Catholic Church of Porto Rico the sum of $120,000, in full satisfaction of all claims whatsoever to property claimed by the Roman Catholic Church in Porto Rico, then in the pos-

session of the United States, among others, the lands known as Santo Domingo Barracks and the land pertaining thereto, and on said date an act of sale was executed by the Bishop of Porto Rico, conveying to the United States all the rights of the Church of Porto Rico in the Santo Domingo Barracks, otherwise called "Santo Domingo Convent," purchase of which was authorized by said act of Congress approved March 4, 1909.

12. On March 2, 1917, the Congress of the United States passed an act entitled "An Act to Provide a Civil Government for Porto Rico, and for Other Purposes" (39 Stat. at L. 951, chap. 145, Comp. Stat. §§ 3803 c, 3803 cc, Fed. Stat. Anno. Supp. 1918, p. 612, §§ 7 and 8 of which read as follows:

Sec. 7. "That all property which may have been acquired in Porto Rico by the United States under the cession of Spain in the treaty of peace entered into on the tenth day of December, eighteen hundred and ninety-eight, in any public bridges, road-houses, water powers, highways, unnavigable streams and the beds thereof, subterranean waters, mines or minerals under the surface of private lands, all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor-works boards of Porto Rico, all the harbor shores, docks, slips, reclaimed lands, and all public lands and buildings not heretofore reserved by the United States for public purposes, is hereby placed under the control of the government of Porto Rico, to be administered for the benefit of the people of Porto Rico, and the legislature of Porto Rico shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all such matters as it may deem advisable: Provided, That the President may from time to time, in his discretion, convey to the people of Porto Rico such

land, buildings, or interests in lands or other property now owned by the United States and within the territorial limits of Porto Rico as in his opinion are no longer needed for purposes of the United States. And he may from time to time accept by legislative grant from Porto Rico any lands, buildings, or other interests or property which may be needed for public purposes by the United States."

. Sec. 8. "That the harbor areas and navigable streams and .bodies of water and submerged lands underlying the same in .and around the island of Porto Rico and the .adjacent islands and waters, now owned by the United States and not reserved by the United States for public purposes, be, and the same are hereby, placed under the control of the government of Porto Rico, to be administered in the same manner and subject to the same limitations as the property enumerated in the preceding section: Provided, That all laws of the United States for the protection and improvement of the navigable waters of the .United States and preservation of the interests of navigation and commerce, except so far as the same may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters: Provided further, That nothing in this Act contained shall be construed so as to affect or impair in any manner the terms or conditions of any authorization, permits, or other powers heretofore lawfully granted or exercised in or in respect of said waters and submerged lands in and surrounding said island and its adjacent islands by the Secretary of War or other authorized officer or agent of the United States: And provided further, That the Act of Congress approved June eleventh, nineteen hundred and six, entitled 'An Act to empower the Secretary of War, under certain restrictions, to

authorize the construction, extension, and maintenance of wharves, piers, and other structures on lands underlying harbor areas in navigable streams and bodies of water in or surrounding Porto Rico and the islands adjacent thereto,' and all other laws and parts of laws in conflict with this section be, and the same are hereby, repealed."

13. That since possession thereof was taken by the military authorities of the United States, all of the Santo Domingo Barracks and land contiguous thereto has been occupied by the United States for military purposes, except that the second floor of said building, now occupied by the insular courts, was on May 17, 1923, and for many years prior thereto, occupied by the supreme court of Porto Rico and District Court No. 1 and District Court No. 2 of Porto Rico, for court rooms, chambers and offices of court officials and court attachés, under permission and sufferance of the military authorities.

14. That Francisco Palacios Salazar, for whose killing the defendant is charged, was shot while ascending the stairway leading to the second floor of the Santo Domingo Barracks on or about the 17th day of May, 1923, and died in the hallway at the head of said stairway where he had fallen. That the person who did said shooting resulting in the death of Francisco Palacios Salazar was on said stairway leading to the second floor of the Santo Domingo Barracks site when the shots resulting in the killing were fired by him.

(Signed) Ira K. Wells,

U. S. Attorney.

Juan B. Soto,

Attorney for Defendant."

There is one fact of importance omitted, and only one. The accused man Iglesias was indicted for the murder of a man named Palacios in the Insular District Court of San Juan before he was indicted in this court for the same killing. At the time the indictment was found in this court, I was aware of the indictment in the Insular court, but was of the opinion that the Insular court did not have jurisdiction, and therefore allowed the United States District Attorney to present the matter to the grand jury of the Federal court. It afterwards developed that the United States District Attorney, in his contention that Iglesias should be tried in the Federal court only, was supported by an opinion rendered by the Attorney General of the United States, also by an opinion rendered by the Judge Advocate General of the United States Army, and the counsel for the accused man declined to argue against the jurisdiction of this court.

Inasmuch, however, as Iglesias had been previously indicted by the local Insular court, and that an opinion had been rendered by the attorney general of Porto Rico that the trial should take place in that court and not in the Federal court, and because I desired all the light possible on the question of jurisdiction, an invitation was extended to the attorney general of Porto Rico to argue the matter as amicus curiæ. During the absence of the Honorable H. P. Coats in the United States, and while the Honorable Miguel Muñoz Morales was the acting attorney general of Porto Rico, argument was had upon this question of jurisdiction.

It is of course of the utmost importance to the accused man that he should be tried before the right court. It is also clearly the duty of the United States court not to assume jurisdiction

of this case unless the facts as agreed upon clearly bring the case within the limitations of the Federal court for Porto Rico. Mr. Muñoz Morales has made an able and ingenious argument in support of his contention that Iglesias should be tried before the local Insular court only, and that the present indictment found by a grand jury of the Federal court should be dismissed.

It would be very agreeable to the writer of this opinion if he could see his way clear to concur in the views so ingeniously expressed by Mr. Muñoz Morales and drop the case from the calendar of this court. It is not a pleasing duty to preside over the trial of any man for murder. I am in complete accord with the views of Mr. Muñoz Morales that there exists no presumption in favor of the jurisdiction of this court; also that this court, in case of doubt, should resolve that doubt against assuming jurisdiction rather than retaining it. Nothing has been read by me for a long time that expressed my views regarding this matter more fully than the language used by the Honorable David J. Brewer, who was an associate justice of the Supreme Court of the United States at the time of his death, and who, while sitting as a circuit judge in the year 1885, rendered an important opinion in the case of Kansas v. Bradley, reported in 26 Fed. 289. In the closing paragraph of his opinion, on page 292, appear the following words: "It must be remembered that in questions of doubt as to jurisdiction the Federal courts should remand. They should not be covetous but miserly of jurisdiction. The overburdened docket of this court should not be loaded with removed cases unless its jurisdiction is clear and the mandates of the law imperatively require it."

Of course that case was an instance of civil litigation, involving a question of removal and remand, but the principle an-

nounced by Justice Brewer should be even more faithfully followed in a case where a man's life is at stake than in a case involving his property only. Therefore, it would be my duty to dismiss this indictment and to turn the accused man Iglesias over to the Insular court, unless, after careful study and determination, I felt convinced that the Federal court alone had jurisdiction to try him.

The question of jurisdiction or the absence of it in this court depends entirely upon the proper construction of the word *exclusive* found in the statutes of the United States Congress which define Federal jurisdiction. In other words, if on May 17, 1923, at the time of the alleged homicide, the United States government was in *exclusive* control of the building in San Juan known as Santo Domingo Barracks, Iglesias is properly triable in this court; if at the time mentioned the United States government was not in the *exclusive* control of the building known as the Santo Domingo Barracks, Iglesias should be tried in the Insular court. It is admitted by all concerned that Palacios was shot while he was on the stairway leading to the second floor of the said building. It is also admitted that the said building was turned over to the officials of the United States Army when Spain vacated Porto Rico in the latter part of the year 1898. The lower floor of this building has been used constantly for commissary purposes in connection with the United States Army, and the upper floor has been occupied by the supreme court of Porto Rico and by the district courts of Porto Rico, § 1 and § 2,—the latter being courts of nisi prius, —under permission given by the military authorities because they did not need the upper floor of the building, and the Insular courts were simply allowed to stay there, rental free,

until their own permanent court room should be erected. This permanent court room has not been erected yet.

Of course it would be absurd to say that these Insular courts are trespassers and have no business in the second floor of the Santo Domingo Barracks, but it would be equally ridiculous to say that they were there as parties to a contract. There was no lease, no rental has ever been paid. It seems to me the case is exactly similar to the case of a person who makes a lawful visit to the commanding officer of the United States Army in San Juan at Casa Blanca. The visitor goes to Casa Blanca on a legitimate errand, but while there commits an act which is a crime at common law, for instance, larceny. Mr. Muñoz Morales argues with great ingenuity that if the title to the property stolen was in the United States government, the thief, although a visitor and not a trespasser, would be properly triable in the Federal court; but if the property stolen belonged to a private individual, then the thief would be triable in the Insular court.

Judge Rose in his recent work on Federal Jurisdiction & Procedure tells us in § 82 that if two men get into a quarrel in the Postoffice building in the city of Baltimore, the offenders are punishable in the United States district court of Maryland, and by it alone. Mr. Muñoz Morales argues that if he enters the Postoffice building here at San Juan and finds that a thief has stolen his mail from his Postoffice box, the offender is properly triable before this court, but if the thief picks the pocket of Mr. Muñoz Morales inside this building, the thief is properly triable before the Insular court. In short, the distinction is attempted to be made with respect to offenses committed on Federal soil in the Island of Porto Rico between crimes which

are offenses against the United States only and crimes which are offenses at common law. Then the argument goes on and it is sought to impose the conclusion upon this court that, because the act with which Iglesias is charged did not involve any officer of the United States government, but the act itself was against all law; in other words, that there was no distinctively Federal crime, the trial should be had before the Insular court, even though the building which was the scene of the killing is the property of the United States government alone.

I wish I could concur in this view so far as my desire not to try this very unpleasant case is concerned, but of course where a judge, after careful consideration of all the decisions bearing upon the matter, finds his mind free from any doubt whatever as to the existence of jurisdiction in his own court, it follows that the only proper order that he can make is to retain jurisdiction.

Only a few more observations are necessary. A very interesting portion of the argument of the Honorable Muñoz Morales dwelt upon the claim at one time made to the Santo Domingo Barracks by the Roman Catholic Church. It seems that some time after the treaty between the United States and Spain, a suit was brought on behalf of the Church to recover the building, upon the theory that the title at the time of the change of sovereignty was not in the Kingdom of Spain, but was in the Church. The case never went to trial. The proper representatives of the United States government deemed it wise to compromise this lawsuit. The Congress of the United States voted a certain sum of money, the Roman Catholic Church received this money and quitclaim deeds were executed. I cannot see how this affects the present question. Assuming that the true

title was in the Roman Catholic Church, such title clearly passed to the United States by the quitclaim deed; but if the Church had no true title, but merely an unjust claim, then the execution by the Church of the quitclaim deed to the United States could not possibly operate to increase or create any rights in the people of Porto Rico.

Another portion of the very ingenious argument by the Honorable Mr. Muñoz Morales was to the effect that the act of the Porto Rico legislature in authorizing a deed to be made to the United States did not operate to pass any title to the United States, because the legislature of Porto Rico had no power to pass such act. Even if it be true that the legislature was without power to pass such an act, a point which I do not find it at all necessary to decide, such a step on the part of the legislature of Porto Rico could not possibly operate in any manner to affect the jurisdiction of this court, which rests entirely upon the acts of the Congress of the United States.

In addition to the case referred to by Judge Rose, and mentioned by me above, where two men have a quarrel in the corridor of the Baltimore Postoffice and their trial takes place before the Federal court, there is an unreported case of an extremely heartless thief, who, during the World War, seized cash belonging to the American Red Cross from a booth in one of the corridors of the Postoffice building in New York city, which booth the officials of the American Red Cross had been allowed to place temporarily in said building for the purpose of soliciting funds. This thief was tried before the Federal court. There was never any thought apparently of trying him before any state court. It is to be observed, furthermore, that the soil upon which the Postoffice building in New York city rests is

owned by the city of New York, while the building was placed upon said lot by a contract between the United States government and the city of New York, which contract provided that the United States government should have the use of the lot for fifty years. The fifty years' period had expired before this theft, and yet the Federal court maintained jurisdiction because the building had not yet been demolished, and has not yet been demolished, although the United States is under obligation to perform that act and restore the possession of the lot to the municipality. In spite of these peculiar facts, it was held that the Federal government was in exclusive jurisdiction of the property.

I will freely admit that at the time of the very abstruse and ingenious oral argument submitted by the Honorable Muñoz Morales, I was much impressed thereby, and it has become necessary for me to study the same at length in order to expose its fallacy. This can best be done by showing the logical results that would flow from the adoption of his theory, which theory is that this court has jurisdiction of crimes purely Federal, if committed upon Federal property, but has no jurisdiction of crimes at common law. Let us see how this works out.

A servant employed in the quarters of Colonel Ross, the commanding officer of the United States Army here at San Juan, steals a wrist watch and an alarm clock. Investigation shows that the wrist watch is the personal property of a member of the family of Colonel Ross, and that the alarm clock belongs to the United States government. This thief would have to undergo two trials, according to the theory of the Honorable Muñoz Morales. He would be tried in this court for the theft

of the alarm clock, and he would be tried in the proper Insular court for the theft of the wrist watch.

Again, let us assume that in the Artillery Barracks here in the city of San Juan there is received a large consignment of harness, and upon opening the cases the officers of the army come to the conclusion that the harness is not according to specifications, whereupon the manufacturers in the United States are notified that the harness is held here subject to their orders. These manufacturers insist that the harness is according to specifications, and bring a suit in the court of claims at Washington, seeking to recover the purchase price. While this suit is pending, burglars break into these Artillery Barracks and carry off the harness. Before these criminals can be tried, according to the theory of the Honorable Muñoz Morales, both the Insular court and the Federal court would be obliged to wait until the decision of the case before the court of claims at Washington, inasmuch as it would be impossible to state whether the title to the harness was in the Federal government or in the manufacturers who made it. Meantime, the Statute of Limitations would probably run, and unless the burglars were indicted in both courts, they would escape punishment.

Once more, take the case of property which is found in a military reservation and in storage there awaiting a claimant, the owner being unknown. During the existence of this condition, thieves break in and steal. The ownership being unknown, and the property being liable to forfeiture to the United States if there is no claimant ever found, how would it be possible to determine with any accuracy the jurisdiction properly cognizable over such offense?

I find myself in entire harmony with the views of Honorable

Muñoz Morales that in case of doubt a Federal court should decline jurisdiction; and it would be exceedingly agreeable to me if I could see my way clear to direct a dismissal of the indictment found by the grand jury of this court, and turn the accused man Iglesias over to the prosecuting attorney of the Insular district court. But the more I have studied this case, the more I have become convinced that the jurisdiction exists only in this court, and I therefore shall feel obliged to direct that Iglesias respond for trial to the indictment found by the grand jury of this court, notwithstanding the fact that he was first indicted by a grand jury of the Insular district court. It is of course of the utmost importance to Iglesias that he should be tried by such tribunal as has lawful jurisdiction over him, in order that, if he be acquitted, such judgment of acquittal be final and conclusive. His own counsel has raised no objection to the trial in this court. I have given careful study and consideration to the claims presented by the representatives of the Insular government as amici curiæ, but, as stated above, find myself unable to concur in these views.

Iglesias will be held for trial in this court, the trial to take place during the month of May, 1924, on such date as the United States district attorney and the counsel for Iglesias may agree. In case of their failure to agree, the court will fix the date.

To this order and opinion the attorney general of Porto Rico excepts.

Done and Ordered in open court at San Juan, Porto Rico, this 23d day of January, 1924.