PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. LUIS
F. VELÁZQUEZ, Defendant and Appellant.*

No. 4927.  Argued May 15, 1933.—Decided December 14, 1933.

* NOTE.—On appeal to the U. S. Circuit Court of Appeals for the First Circuit, this decision was reversed and the cause remanded, with directions.  See 77 F. (2d) 431. Certiorari denied, *Puerto Rico* v. *Velázquez*, 296 U.S. 602.

*Pedro Albizu Campos* for appellant.   R. A. *Gómez, Fiscal,* for appellee.

Mr. Justice Wolf delivered the opinion of the Court.

In the Municipal Court of San Juan, Luis F. Velázquez was charged with having committed an aggravated assault and battery on the person of Emilio del Toro, Chief Justice of the Supreme Court of Puerto Rico. In the complaint it was sufficiently expressed that the alleged offense took place in San Juan and was committed while the Chief Justice was in the discharge of the duties pertaining to his office.

After a trial *de novo* in the District Court of San Juan, the defendant was convicted of the crime charged and sentenced to imprisonment for one year.

On appeal to the Supreme Court of Puerto Rico, both the defendant and the *Fiscal* of this court filed their briefs. Subsequently, however, the appellant filed a motion to dismiss the case alleging that the People of Puerto Rico did not have jurisdiction over the crime, inasmuch as the facts occurred in a place which was the exclusive property of the United States. The case was set for a hearing and on the day fixed the parties appeared by their respective attorneys and solely discussed the question of jurisdiction. Then both sides asked for time within which to file briefs. The appellant repeatedly asked for extensions of time which, considering the serious question involved, we felt bound to grant, so that the case was not finally submitted to us until the 15th of May of this year. In that brief the appellant relied exclusively on the case of *United States* v. *Iglesias,* 13 P.R. Fed. 282. Intuitively it may be said that the solution of the problem presented no great difficulty, but as so frequently happens in judicial work or even in other matters of decision, the steps to justify the conclusion are not so easy to relate.

The appellant maintains that the Santo Domingo Barracks was the exclusive property of the United States. The Santo Domingo Barracks was alleged to belong to the Crown of Spain, although the Catholic Church claimed the same property. The controversy between the United States and the Church was settled by a compromise in which the said property was ceded or released to the United States or the People of Puerto Rico, as the case may be. When the act complained of took place the lower floor of the building was occupied by the Commissary of the local regiment of the United States Army. The second floor was occupied by the Supreme Court of Puerto Rico and by a part of the District Court of San Juan. In the Santo Domingo Building in Spanish times the Audiencia Territorial held its sessions. When the military authorities took charge of Puerto Rico, the Supreme Court of Puerto Rico and the District Court of San Juan were given permission or allowed to continue to hold their offices in the Santo Domingo Barracks. The People of Puerto Rico was allowed to occupy these premises, if not by the express permission of the military authorities, at least by their sufferance and consent.

Section 33 of the Organic Act of Puerto Rico of April 12, 1900, known as the Foraker Act, provided:

"That the judicial power shall be vested in the courts and tribunals of Porto Rico as already established and now in operation, including municipal courts under and by virtue of General Orders numbered one hundred and eighteen as promulgated November twenty-ninth eighteen hundred and ninety-nine, by Brigadier General Davis, United States Volunteers, and the laws and ordinances of Porto Rico and the municipalities thereof in force, so far as the same are not in conflict herewith; all which courts and tribunals are hereby continued. The jurisdiction of said courts and the form of procedure in them, and the various officials and attachés thereof, respectively, shall be the same as defined and prescribed in and by said laws and ordinances, and said General Orders numbered one hundred and eighteen and one hundred and ninety-five, until otherwise provided by law: *Provided, however,* That the Chief Justice and associate Justices of the

Supreme Court and the marshal thereof shall be appointed by the President, by and with the advice and consent of the Senate, and the judges of the district courts shall be appointed by the Governor, by and with the advice and consent of the Executive Council, and all other officials and attachés of all the other courts shall be chosen as may be directed by the Legislative Assembly, which shall have authority to legislate from time to time as it may see fit with respect to said courts, and any others they may deem it advisable to establish, their organization, their procedure, and all other matters affecting them.''

Tacitly at least there are various phrases in this section which show that the state of facts existing in regard to the courts of Puerto Rico was continued in force by the said Organic Act. In the opinion of Judge Odlin, of the Federal Court, the comment is made that no release was ever made and no compensation paid to the United States for the use of these premises by the People of Puerto Rico. However, the Supreme Court of Puerto Rico was in complete occupation of the said premises and no official of the United States or of its Army ever disputed the possession by the said court. Therefore, the Supreme Court of Puerto Rico is entitled to the benefit of all the presumptions that flow from the possession of a piece of property; for example, that the said possession is legal and with due authority. The Supreme Court of Puerto Rico was there by the license and authority of the United States, if not for other reasons.

On July 1, 1902, ''the Congress of the United States passed an act entitled, 'An Act Authorizing the President to Reserve Public Lands and Buildings in the Island of Porto Rico for public Uses, and Granting Other Public Lands and Buildings to the Government of Porto Rico, and for other Purposes,' sec. 1 of which reads as follows: 'That the President be, and he is hereby, authorized to make, within one year after the approval of this act, such reservation of public lands and buildings belonging to the United States in the Island of Porto Rico, for military, naval, lighthouse, marine hospital, postoffices, customhouses, United States Courts, and

other public purposes, as he may deem necessary, and all the public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in said Island and not so reserved, be, and the same are hereby, granted to the Government of Porto Rico, to be held or disposed of for the use and benefit of the people of said Island; *Provided,* That said grant is upon the express condition that the Government of Porto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President under the provisions of this act: *And provided further,* That nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the Government of Porto Rico or by any other party, under any contract, lease, or license made by the United States authorities prior to the first day of May, nineteen hundred.' (32 Stat. at L.731, chap. 1383, Comp. Stat. sec. 3761, 7 Fed. Stat. Anno. Supp. p. 1281).'' *United States* v. *Iglesias, supra.* The phrase ''That nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the Government of Porto Rico or by any other party, under any contract, lease, or license made by the United States authorities prior to the first day of May, nineteen hundred,'' was a sufficient recognition of the possession by the Supreme Court of Puerto Rico or the People of Puerto Rico of the part of the building in question.

Under this sufferance or license the Supreme Court of Puerto Rico continued to occupy the second floor of the said building until the date of the alleged offense.

Under the Act of Congress of 1902 already cited, the President was allowed to make reservations of property, but, so far as the Santo Domingo Barracks was concerned, he did not make the reservation until 1903, when nearly one year had elapsed. Meanwhile, until reservation was actually made, the jurisdiction of Puerto Rico under the act itself

attached. The reservation was made, as has been said, in 1903, but no attempt was made to divest the Supreme Court of Puerto Rico or the People of Puerto Rico of the territory recognized by the said Act of 1902. There was no attempt by the United States to take possession of the second floor of the building.

The Constitution of the United States provides in the seventeenth clause of section 8, art. I, that the Congress shall have power "to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square), as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." Under this precept and some of the acts of Congress made pursuant thereto a number of controversies have arisen between the various states of the Union and the Government of the United States. Unquestionably, where a cession of property is made by a state to the Federal Government the jurisdiction of the United States as a general rule attaches, as may be seen by the authorities to be cited hereafter. Exceptions are made when the ceding state makes certain reservations. When, however, a building is used as an arsenal, post-office or the like, by cession of a particular state, the exclusive jurisdiction of the United States generally attaches and a crime committed in such building must therefore be prosecuted by the officers of the United States as such. The respective states then have no further jurisdiction. It should be remembered that the question whether Puerto Rico could be considered a state within the constitutional sense depends upon the subject matter. We may say now and we shall enlarge it hereafter that essentially there is not the same conflict of jurisdiction between a territory of the United States and the United States as between

the United States and a state. Assuming for the moment that the local jurisdiction of Puerto Rico is to be contrasted to the jurisdiction of the United States in the same way as the jurisdiction of a state might be, there are several things to be noticed. One is that in order to obtain exclusive jurisdiction under the constitutional precept the cession must be made by the state itself. We are not quite sure that such a cession was made, although authorized by the Legislature. Section 1673 of the Revised Statutes; *People* v. *Fortuna Estates,* 279 Fed. 500, 507.

Another thing to be noticed is that where the United States, although having exclusive jurisdiction, permits a state to occupy for local purposes the ceded property, the United States does not and can not claim exclusive jurisdiction.

*Palmer* v. *Barrett,* 162 U.S. 399 is an interesting case. To be sure, the State of New York reserved to itself certain jurisdiction. The state reserved rights over the ceded lands but the case is authority for the fact that when two governments are contracting, one of them may surrender, or may not obtain an exclusive jurisdiction. In other words, it is within the power of one of the high contracting parties not to take exclusive jurisdiction, although within its power to do so. Other cases showing a surrender of jurisdiction by the United States or by a state, the effect thereof, or the retention of jurisdiction, are as follows: *United States* v. *Bateman,* 34 Fed. 86; *Exum* v. *State of Tennessee,* 90 Tenn. 501, 15 L.R.A. 381; *Fort Leavenworth R.R. Co.* v. *Lowe,* 114 U.S. 525; *Chicago & Pacific Railway Co.* v. *Mc Glinn,* 114 U.S. 542; *State* v. *Stevens,* 199 Pac. 256, 260; *State* v. *Frazier,* 180 Pac. 523; *People* v. *Burke,* 126 N.W. 446.

At the hearing of this case we suggested to the parties the case of *In re Neagle,* 135 U.S. 1. There the alleged offense was clearly committed within the State of California. Neagle was indicted for having assaulted and killed Terry when the said Neagle was accompanying Mr. Justice Field

in the exercise of his duties as Justice of the United States Supreme Court on circuit and Terry had made an attack on Judge Field. The Supreme Court of the United States held that an assault upon a judge of a court of the United States while in discharge of his official duties is a breach of the peace of the United States as distinguished from the peace of the state in which the assault takes place.

The Supreme Court of Puerto Rico and its predecessor, with the consent of the United States officials, were allowed to occupy the Santo Domingo Barracks with the consent of the military authorities from 1898. The People of Puerto Rico is a quasi-sovereign created by the Congress of the United States, and its judicial power is vested in the Supreme Court and other courts by the Foraker Act, the Jones Act and even by the military orders. The jurisdiction of The People of Puerto Rico was necessarily extended to the Supreme Court of Puerto Rico, actually occupying a part of the second floor of the said building. When the Supreme Court of Puerto Rico was allowed to occupy the said second floor for so many years the police power of the People of Puerto Rico extended *pro tanto* to punish crimes committed in that part of the territory occupied with the acquiescence of the United States. The criminal laws of Puerto Rico existed in every place to which the police power of Puerto Rico extended. It could not be said that the United States had the exclusive jurisdiction over the whole of the Santo Domingo Barracks. The Supreme Court, as a branch of The People of Puerto Rico, was in complete possession of part of the second floor of the building and the District Court occupied the rest of the floor.

We have been assuming, as we have indicated, that Puerto Rico might be treated locally as a state. In point of fact it is not so. There can be no possible fundamental conflict of jurisdiction between The People of the United States and The People of Puerto Rico. The United States is sovereign in both instances. Nothing could make this clearer than the

case of *Grafton* v. *United States,* 206 U.S. 333. Grafton had been convicted of an offense against the military laws by a court-martial in the Philippines. The Philippine Government attempted to punish him for the same act committed within the territory of the islands. The Supreme Court of the United States held that this would be to subject him twice to punishment for the same offense; that the prohibition of former jeopardy is applicable to all criminal prosecutions in the Philippine Islands; that the same act when committed in a state might constitute two different offenses, one against the United States and another against the state, but the rule did not apply for acts committed in the Philippine Islands. The United States or its authorities, civil and military, has the right to permit the occupation of any of its property by the people of a territory. And this was done in the case before us. The jurisdiction of Puerto Rico, with the consent of the United States, extended to the place where the crime was committed. For a parity of reasoning, see the case of *Rivera et al.* v. *Lawton,* 35 F (2d) 823.

We can not agree with the opinion of the Judge of the U.S. District Court for the District of Puerto Rico that the Santo Domingo Barracks was under the exclusive jurisdiction of the United States as distinguished from the jurisdiction of Puerto Rico.

We come then to the merits. Among other things, the appellant maintains that there was no aggravated assault and battery; that the Chief Justice was not in the exercise of his official duties but that the evidence tended to show that he had just taken his lunch and was strolling about his room when he was assaulted by the defendant-appellant in this case. It is too clear for much argument that when a judge is in his court, in the building, where his duties are performed, resting, or thinking, or reading, he is there in the discharge of his duties, unless or until the contrary is made to appear.

An aggravated assault and battery exists "1. When committed upon an officer in the lawful discharge of the duties of his office, if it was known or declared to the offender that the person assaulted was an officer discharging an official duty." Sec. 5664 of the Revised Statutes of 1911. But it also exists "2. When committed in a court of justice," etc.

The appellant also maintains that there was no *mens rea;* that the attack of the defendant was slight and merely as one gentleman to another to demand a "satisfaction" of the Chief Justice because of certain statements made by him on a public occasion; that the defendant made his attack in justification of his own political views. However, a mere difference of political views does not justify an assault and battery. The fact that what defendant did was a challenge does not take the act out of the general rule. The Constitution and the laws of the United States, so far as applicable, and the laws of Puerto Rico, apply to every bit of territory under the jurisdiction of Puerto Rico, and an intent follows from the act done and is not affected by the motive suggested in this case.

We find no reason for interfering with the discretion of the court below in inflicting the punishment.

The judgment appealed from will be affirmed.

Mr. Chief Justice Del Toro took no part in the decision of this case.